**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CONNIE CROUSE, ) | |
| ) | CASE NO.    1:09-CV-01640 |
| Plaintiff, ) | |
| ) | |
| v.            ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|     Commissioner of Social Security    ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Connie Crouse ("Crouse") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Crouse's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court AFFIRMS the final decision of the Commissioner.

### I. Procedural History

On September 13, 2005, Crouse filed an application for POD, DIB, and SSI alleging she became disabled on September 8, 2005 due to pain caused by a number of back impairments and depression. Her application was denied both initially and upon reconsideration. Crouse timely requested an administrative hearing.

On August 15, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Crouse, represented by counsel, testified. Charles McBee testified as the vocational expert ("VE"). On December 17, 2008, the ALJ found Crouse was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

### II. Evidence

*Personal and Vocational Evidence*

Born on January 25, 1973, and age thirty-five (35) at the time of her administrative hearing, Crouse is a "younger" person under social security regulations. *See* 20 C.F.R. § 404.1563(C) & 416.963(C). She has a limited education and past relevant work as a home health aide and nurse's aide. (Tr. 23.)

*Medical Evidence*

On January 4, 2005, Crouse visited the Get Well Center and was prescribed medications for her back pain and anxiety by Young Kang, M.D. (Tr. 183.)

On June 15, 2005, Crouse returned to Dr. Kang's office complaining of neck, back, and left hip pain. (Tr. 185-86.) Dr. Kang continued to prescribe medications and ordered that x-rays be taken. (Tr. 185.)

On June 28, 2005, x-ray and imaging tests revealed straightening of the cervical spine with loss of normal cervical lordosis, mild to moderate disc space narrowing at L5-S1, mild lumbosacral spondylosis, minimal levo-scoliosis of the lumbar spine, and degenerative changes in her lumbar spine (Tr. 167-68.)

Crouse visited Dr. Kang in July, August, and early September 2005 for pain management (Tr. 187-89, 191.-92) On September 7, 2005, Dr. Kang wrote on a prescription note pad, "Medical Illness –> unable to work at this point as of 9/7/05 –> Pt is filing for SSI." (Tr. 231.)

From October 2005 through February 2006, Dr. Kang continued to prescribe pain and anxiety medications. (Tr. 184, 194-98, 202, 204-05.)

On December 5, 2005, an x-ray of Crouse's left hip was normal. (Tr. 169.)

On March 8, 2006, Dr. Kang's treatment notes indicate that Crouse's "pain is about the same / unable to move her neck," but also indicates that Crouse "feels like pain is better. Burning sensation is better." (Tr. 205.)

On March 11, 2006, Thomas Evans, Ph.D., conducted a consultative psychological evaluation. (Tr. 130.) Crouse told Dr. Evans that she was living with her husband and daughter, and got along "okay" with her co-workers and people in general. (Tr. 131.) She denied ever having abused drugs or alcohol, but smokes one pack of cigarettes daily. *Id*. She was five feet tall and weighed 246 pounds. (Tr. 132.) Crouse reported her depression as occurring "on and off for the past 10 ½ years." *Id*. Dr. Evans assessed Crouse's mood as euthymic, but with slightly constricted affect. *Id*. Crouse "sat comfortably in her seat throughout the entire evaluation" without signs of "any physical distress." *Id*. Dr. Evans assessed Crouse's insight into her situation as adequate and her social judgment as fair. (Tr. 133.) He opined that she

likely had moderate impairments with respect to her abilities to concentrate and pay attention to tasks, follow complex directions, and deal with the general public. (Tr. 134.) Furthermore, her ability to withstand stress and pressure was likely to be markedly impaired, but that she had adequate ability to follow simple and repetitive directions. *Id*. He diagnosed her with dysthymic disorder, panic disorder without agoraphobia and ascribed her a Global Assessment of Functioning ("GAF") score of 50.[1] (Tr. 134-35.)

On March 13, 2006, an MRI revealed a suggestion of very early degenerative disc disease, diffuse disc bulge at L2-L3, slight hypertrophy of L3-L4 and L4-L5 facet joints, moderate hypertrophy of L5-S1 facet joints, and Grade I spondylolisthesis with a suggestion of spondylolysis. (Tr. 162-63.)

On April 11, 2006, Jennifer Swain, a state agency consultant, opined that Crouse had moderate limitations with respect to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, but no episodes of decompensation of an extended duration. (Tr. 150.) She found that Crouse was capable of following simple instructions. (Tr. 138.) However, Swain gave less weight to Dr. Evan's opinion that Crouse was markedly impaired with respect to stress tolerance, because she felt that opinion was not supported by other observations and evidence in Crouse's file. *Id*. She concluded that Crouse could work in a setting in which her duties were routine and predictable. *Id*. She also opined that Crouse could interact appropriately with others, although Crouse might be limited

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

to superficial contacts. *Id*. On July 22, 2006, Caroline Lewin, Ph.D., affirmed this mental health evaluation. (Tr. 165)

On April 14, 2006, state agency medical consultant Gerald Klyop determined that Crouse could lift fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for six hours in a workday, sit for six hours in a workday, and push/pull without limitation within the above restrictions. (Tr. 155.) On July 26, 2006, Myung Cho, M.D., affirmed the RFC assessment. (Tr. 166.)

On December 27, 2006, imaging studies of Crouse's cervical spine indicated straightening but no significant disc bulge, herniation, or free fragments. (Tr. 170.)

On January 11, 2007, Dr. Kang's treatment notes indicate that Crouse stopped taking Zocor due to muscle pain. (Tr. 221.) He also appeared to be considering whether Crouse suffered from fibromyalgia. *Id*.

On March 8, 2007, Crouse reported to Dr. Kang that her neck and lower back pain were "stable" and "under reasonable control," and she indicated that the extra medicine helped "a lot." (Tr. 223.)

On August 24, 2007, Crouse visited an emergency room ("ER") complaining of additional back pain after a fall. (Tr. 300.) Crouse underwent x-rays of her lumbosacral spine, which showed an acute lumbar strain and spondylolisthesis. (Tr. 299-301.)

On August 29 and 30, 2007, Matthew Call, a physical therapist, conducted a standardized Isernhagaen Work System Functional Capacity Evaluation. (Tr. 171-82.) He noted "[t]here was evidence of significant self-limiting behaviors" and that the test "does not identify the client's maximal functional abilities ... [r]ather, it identifies what the client is willing to do." (Tr. 171.)

Mr. Call noted that Crouse exhibited the following forms of pain behavior: "verbalized her pain;" "demonstrated facial grimacing;" and, "frequently had her left hand placed atop her left hip." (Tr. 173.) However, Crouse failed to meet four out of thirteen consistency indicators – failure in three or more indicators is considered an inconsistent or non-maximum performance. (Tr. 172, 178.) She also declined to complete two of the thirteen tests for consistency, which Mr. Call stated was "an indication immediately of self-limiting behavior." (Tr. 172.) During one such test on a computerized system, Crouse only generated a negligible amount of push/pull power, which "d[id] not compare to the force of activities of daily living," such as opening a door or using a shopping cart. (Tr. 172-73.) Mr. Call concluded that, due to Crouse's self-limiting behavior, "[n]o projections can be made regarding her capabilities." (Tr. 173.)

On September 12, 2007, a follow-up MRI revealed grade I to II spondylolisthesis, mild degenerative disc disease, and no disc herniation or bulge. (Tr. 305.)

On September 13, 2007, Crouse began seeing Theodore J. Togliatti, M.D., for specialized pain management. (Tr. 246.) Crouse reported that she could not tolerate standing, sitting, or walking for more than twenty minutes due to sharp, constant, burning, and shooting pain. *Id*. She noted that heat and her current medications helped improve her pain symptoms, and that, with medications, she was able to continue with her daily activities. *Id*. Dr. Togliatti diagnosed Crouse with lumbar facet arthropathy, sacroiliac joint dysfunction, and myofascial pain. *Id*. He began a trial of mild opioid pain relievers. *Id*.

On October 4, 2007, Crouse again complained of low back pain. (Tr. 248.) Dr. Togliatti recorded in the "social history" section of his notes that Crouse was married with four children, that she had a high school education, and that she was "currently disabled and unable to work."

6

*Id*. Dr. Togliatti administered a right-sided lumbar facet injection later that month. (Tr. 251.)

On a November 14, 2007 visit to Dr. Togliatti, Crouse reported about 75% relief from the right-sided facet injection and stated that she was more mobile. (Tr. 252.)

In December of 2007, Dr. Togliatti administered additional right and left-sided lumbar facet injections. (Tr. 253-56.) On January 8, 2008, Crouse reported that the injections relieved about 60% of her lower back pain, although she also reported nausea and vomiting after the injections. (Tr. 257.) She indicated that her symptoms had been "stable since the last visit." *Id*.

On February 7, 2008, Crouse informed Dr. Togliatti that she was "doing well overall" and continued to experience "good relief" from her recent injections, estimating her symptoms had improved by "about 70%." (Tr. 258.) She also reported that she could "tolerate more activity" and was "able to walk much, much further." *Id*.

On March 6, 2008 and April 3, 2008, Crouse reported that, while her last injections had improved her low back pain, she experienced increased radiating pain in her left leg. (Tr. 259-60.) Dr. Togliatti scheduled a series of enhanced lumbar epidural steroid injections to address her worsening radicular symptoms. *Id*. Dr. Togliatti wrote in his treatment notes that "Miss Crouse is unable to work at the current time." (Tr. 260.)

In subsequent visits to Dr. Togliatti between April 29, 2008 and July 15, 2008, Crouse reported intermittent improvement stemming from her treatment/medication regimen, but also, at times, increased pain. (Tr. 252, 257-68.)

On August 6, 2008, an x-ray and MRI of Crouse's cervical spine showed no significant changes since the December 2006 imaging studies. (Tr. 271.)

On October 22, 2008, Crouse complained that the injections were not working and that

7

she had a lump on her back at the site of the injection. (Tr. 329.)

***Hearing Testimony***

At the hearing, Crouse testified to the following:

- She does not drive because her driver's license was revoked a few years earlier for failing to pay child support. (Tr. 340.)

- She worked until September of 2005, but can no longer tolerate working due to increased pain. (Tr. 341.)

- She identified her inability to deal with stress as the problem that most prevented her from working. *Id*.

- She identified her pain as an eight on a ten point scale, where ten is "emergency room level pain." Her pain rating is inclusive of her pain medication. (Tr. 342.)

- She feels pain in her back, neck, left hip, and left leg. *Id*.

- The steroid injections helped "a little bit," but the relief lasted only about a week. (Tr. 343.)

- She is unable to perform any chores at home, and her husband and daughter take care of everything. She can, however, attend to her own personal hygiene and dress herself. (Tr. 344.)

- She has trouble sitting for prolonged periods of time and can sit for only about fifteen to twenty minutes before becoming uncomfortable. She can tolerate standing and walking about fifteen to twenty minutes. She can barely lift a gallon of milk. (Tr. 345-46.)

- She has severe depression and panic attacks. She takes Adderall and Xanax for her mental impairments. The medications help a little bit, but her mind still races and it is difficult for her to concentrate. (Tr. 346-48.)

- She never reads, but sometimes watches television. (Tr. 348.)

- She hardly sleeps and experiences crying spells several times a day. *Id*.

- She suffers panic attacks two or three times weekly that last from ten to twenty minutes. (Tr. 349-50.)

- She has no friends she sees on a regular basis. (Tr. 350.)

- She is financially supported by her husband, who works part time. They live in subsidized housing. (Tr. 354-55.)

- She quit going to see mental health professionals because they kept prescribing different medications that did not work. She instead receives treatment for depression from her family doctor. (Tr. 357.)

The ALJ posed the following hypothetical to the VE:

[A]ssume an individual and such as the claimant who has the physical ability to sit, stand, and walk six hours in an eight hour day; lift and carry 20 pounds occasionally and 10 pounds frequently; but is limited to unskilled work with limited contact with others, is there other work that such an individual could perform in the region or economy.

(Tr. 363.)

The VE testified that such an individual could perform jobs at the light exertional level, such as inspector hand packager, folder, and a bagger of garments. (Tr. 363-64.) The ALJ asked whether the hypothetical person would be employable if the exertional level was changed to sedentary together with a sit/stand option, and limited contact with others. (Tr. 364.) The VE stated that such a person could perform the following jobs: table worker; hand mounter; and waxer. *Id*. The VE further stated that a limitation to low-stress work would not preclude these jobs. *Id*. However, no jobs would be available if the hypothetical individual could only sit and stand for five to ten minutes at a time, could only lift one to two pounds, and required frequent and unscheduled stops. *Id*. The VE opined that to be competitively employable, an individual must be on task at least eighty percent of the time. (Tr. 365.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

9

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Crouse was insured on her alleged disability onset date, September 8, 2005, and remains insured through September 30, 2010. (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Crouse must establish a continuous twelve month period of disability commencing between September 8, 2005 and the date of the ALJ's decision. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must

---

[2] The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Crouse established medically determinable, severe impairments due to spondylolisthesis, moderate disc space narrowing, degenerative disc disease, and depression. However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Crouse is unable to perform her past work activities, but has a Residual Functional Capacity ("RFC") for a limited range of sedentary work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Crouse is not disabled.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

### VI.  Analysis

On appeal, Crouse claims the ALJ erred by: (1) failing to grant appropriate weight to the

opinions of her treating physicians; (2) improperly finding her testimony not credible; and (3) finding she was not disabled.

***Treating Physicians***

Crouse asserts that the ALJ erred by failing to grant appropriate weight to the opinions of her treating physicians – specifically, the opinions of Dr. Kang and Dr. Togliatti. (Pl.'s Br. at 7-8.) Crouse contends both physicians agreed that she suffered from multiple spinal ailments, an anxiety disorder resulting in frequent panic attacks, depression, and emotional volatility, rendering her unable to work as of September 8, 2005. *Id.*

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[3]

---

[3] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how

However, the opinion of a treating physician must also be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

The question of whether a claimant is disabled is an issue expressly reserved for the Commissioner and does not constitute a medical opinion. 20 C.F.R. § 404.1527(e). An ALJ need not give any weight to a conclusory statement of a treating physician that a claimant is disabled, and may reject determinations of such a physician when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled," as it is the Commissioner who must make the final decision on the ultimate issue of whether an individual is able to work. *See* 20 C.F.R. § 404.1527(e)(1); *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982). Dr. Kang's and Dr. Togliatti's conclusions that Crouse was unable to work are not medical opinions and are not

---

well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

entitled to any special weight.

Crouse argues that the physicians' "treatment records support that [she] has a marked restriction in her activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, and pace." (Pl.'s Br. at 7.) Crouse, however, fails to point to any portion of the medical record where either Dr. Kang or Dr. Togliatti offered *any* opinion whatsoever regarding her ability to engage in activities of daily living, her social functioning, or her ability to maintain concentration, persistence, and pace. As such, it is unclear what restrictions Dr. Kang and Dr. Togliatti assigned to Crouse that rendered her, in their opinion, unable to work. In fact, the ALJ specifically noted that "neither [treating physician] explained how he arrived at the conclusion that [Crouse] is unable to work." (Tr. 22.)

Rather, Crouse's contention that she has marked limitations in three categories – and that these limitations are supported by Dr. Kang's and Dr. Togliatti's treatment notes – appears to be nothing more than her own inference or conclusion. While Crouse asserts that the ALJ is not presumed to have any medical or diagnostic expertise, she essentially asks this Court to construe her own interpretation of the treating physicians' notes as the opinions of the physicians themselves. The Court declines to do so, as only the *actual* opinions of the treating physician's are entitled to special consideration. As such, her assignment of error is without merit.

*Credibility*

Crouse next asserts that the ALJ erred by finding that her testimony was not credible. (Pl.'s Br. at 9.) Crouse contends that the ALJ's credibility analysis consisted of nothing more than a conclusory statement together with a recitation of the standard for considering subjective complaints of pain. *Id*.

14

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id*. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross*, 373 F. Supp. 2d at 733 (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

> The ALJ's decision contains the following discussion regarding credibility:
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The medical evidence suggests that the claimant has a tendency to exaggerate both her physical and her mental symptoms. When Dr. Evans examined her in March 2006, she alleged that her depression was a level ten on a ten-point scale at a time when her mood appeared to be normal to Dr. Evans. He saw no signs of anxiety. Similarly, when she underwent a functional capacity evaluation in August 2007, she was observed to be voluntarily limiting her effort in a situation in which she was expected to put forth maximum effort and was grimacing and exhibiting pain behaviors out of proportion to the objective signs of pain and functional limitations.

(Tr. 22.)

The ALJ's reasoning concerning Crouse's credibility is sufficiently clear. The ALJ clearly discounted the severity of Crouse's alleged pain due to the aforementioned exaggerated behavior. The absence of genuine effort by Crouse during the functional capacity evaluation is certainly a legitimate reason for the ALJ to discount her testimony. Self limiting behavior during a test designed to measure a claimant's abilities is sufficient reason for the ALJ to doubt Crouse's allegations as to activities of daily living, the location, duration, frequency, and intensity of her pain, and perhaps even the effectiveness of her treatment and medication. As

such, Crouse's assignment of error is not well taken.

*Substantial Evidence*

In her third assignment of error, Crouse argues that the ALJ's decision is not supported by substantial evidence, because substantial evidence supports only the conclusion that she is disabled. (Pl.'s Br. at 10.) Again, Crouse argues that both Dr. Kang and Dr. Togliatti found that Crouse was unable to work. *Id*. She avers that the case should be remanded in order for proper weight to be accorded the opinions of the treating physicians. *Id*. As discussed above, such conclusions are not entitled to any weight as disability is an issue expressly reserved for he Commissioner. This assignment of error simply rehashes the argument presented in Crouse's first assignment of error and is without merit.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

> s/ Greg White
> U.S. Magistrate Judge

Date: June 10, 2010